UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

        Plaintiff/Respondent,

           v.

VIRGINIA DILLARD,

        Defendant/Movant.

_____/

CASE NO. 2:11-CR-20248
2:13-CV-13025
JUDGE PAUL D. BORMAN
MAGISTRATE JUDGE PAUL J. KOMIVES

**REPORT AND RECOMMENDATION**

I.    <u>RECOMMENDATION</u>: The Court should summarily dismiss defendant's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255, and should deny defendant a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Background*

Defendant/movant Virginia Dillard is a federal prisoner, currently confined at the Federal Correctional Institution in Danbury, Connecticut. Defendant was charged in this Court in a 31 count indictment brought against defendant and her codefendant, Gwendolyn Washington. Specifically, defendant was charged with one count of conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances, 21 U.S.C. § 846; five counts of possession with intent to distribute controlled substances and aiding and abetting the same, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2; and one count of distribution of controlled substances and aiding and abetting the same, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2. The facts leading to the charges against defendant were

accurately summarized by the Sixth Circuit on defendant's direct appeal:

>    Gwendolyn Washington is a medical doctor previously practicing in Detroit. Virginia Dillard is Dr. Washington's niece and was an employee in her office. Dr. Washington had a general practice, and many of her patients were Medicare beneficiaries. Federal agents, suspecting Dr. Washington of committing healthcare fraud, executed a search warrant at her office in January 2010. Medicare then ceased all payments to Dr. Washington for February and March 2010 and, beginning in April 2010, subjected her bills to heightened scrutiny. These changes resulted in a dramatic decline in Medicare payments to Dr. Washington.
>
>    To compensate for the medical practice's declining fortunes, Dr. Washington and Dillard hatched a plan to sell prescription drugs on the street. Under this plan, Dr. Washington would write prescriptions—not requested by any patient—for powerful Schedule II painkillers. Dillard would then pick up the painkillers at pharmacies in Detroit and sell them on the street to drug dealers she knew. The scheme worked as planned. Dr. Washington began writing fake prescriptions for OxyContin in February 2010. Around August 2010, when the manufacturer changed OxyContin's formula to curtail its abuse, Dr. Washington switched to prescribing Opana ER, which is like OxyContin but twice as potent. And then, in December 2010, Dr. Washington began prescribing Roxicodone, which works much more quickly than the other two drugs. In making these changes, Dr. Washington apparently took her cues from Dillard, who was familiar with the demand on the street.
>
>    At the beginning of the scheme, Dr. Washington attempted to fill OxyContin prescriptions through the mail-order pharmacy MEDCO in addition to using Detroit-area pharmacies. But MEDCO's investigators contacted several of Dr. Washington's patients to verify the prescriptions. The patients told MEDCO that they had never been prescribed OxyContin and had never even heard of the drug.
>
>    Suspecting wrongdoing, federal agents initiated surveillance of Dr. Washington in August 2010. The surveillance showed Dillard driving Dr. Washington's car to various pharmacies in Detroit and filling prescriptions for Schedule II painkillers. When picking up the medications, Dillard would falsely tell the pharmacists that she had patients in the car who were unable to walk in. Later surveillance showed Dillard making the pharmacy trips alone. On one occasion in February 2011, agents saw Dillard drive to a pharmacy, enter the pharmacy, exit with a white bag, drive to a residence, enter the residence, and emerge shortly afterwards without the white bag. Data from the Michigan Automated Prescription System (MAPS) revealed that three prescriptions of Opana ER by Dr. Washington, totaling 180 40–milligram tablets, were filled on that day. The data also revealed that no one at the residence visited by Dillard was prescribed controlled substances at the time.
>
>    Agents conducted surveillance on Dillard again in March 2011. They saw that Dillard and another person left the medical office in the morning and drove to Pickens Pharmacy. Dillard entered the pharmacy and exited shortly afterwards with a white bag. She then walked to a nearby liquor store, where she got into a waiting

car. The agents followed the car and pulled it over. Dillard was found to have on her person 60 Opana PR pills, 90 Roxicodone pills, and six prescriptions written by Dr. Washington, including two for Roxicodone and two for Xanax.

Two days later, Dr. Washington confessed to participating in a drug-distribution conspiracy with Dillard. Dr. Washington admitted that, starting in February 2010, she would write prescriptions for painkillers and Dillard would fill the prescriptions and sell the drugs. For every OxyContin prescription that Dr. Washington wrote, the doctor would receive approximately $1,000 and Dillard would receive approximately $600.

Dillard confessed to the drug-distribution scheme in an interview with FBI agents later in March 2011. According to Dillard, Dr. Washington "had gone from a rich doctor to a broke doctor" after her difficulties with Medicare billing. She needed money, and she asked Dillard to help sell prescription narcotics. Dr. Washington knew that Dillard, a former drug addict and drug seller, would know people who were in the market for prescription drugs. Dillard stated that, in one transaction, she sold 90 80–milligram tablets of OxyContin for approximately $2,200, kept $800, and gave $1,400 to Dr. Washington. She also confessed to a similar transaction where she sold Opana ER for $2,000, kept $400, and gave $1,600 to Dr. Washington. Dillard knew that some of the people to whom she was selling drugs would turn around and sell the drugs to other people. She admitted that she would fill prescriptions at least once a week at Pickens and Focus Pharmacies, and that she sold prescription narcotics "roughly two to three times per week."

In her FBI interview, Dillard named several people to whom she had sold drugs and several non-patients who had approached Dr. Washington for painkillers. She also said that Pickens Pharmacy was "crooked" and overbilled insurance companies. But she did not name any participants other than herself and Dr. Washington in the prescription and pickup end of the drug-distribution scheme. Nor did Dillard identify anyone other than herself who made the first sales (as opposed to subsequent resales) of the drugs.

*United States v. Dillard*, 505 Fed. Appx. 516, 517-18 (6th Cir. 2012).

On July 26, 2011, defendant pleaded guilty to each of the charges against her. There was no plea agreement with the Government. The sentencing proceedings were also accurately summarized by the Sixth Circuit:

The Probation Department prepared a Presentence Report in September 2011, and the district court held a sentencing hearing in October. Aside from a number of objections to minor factual details that did not affect her sentence, Dillard's only objection to the Presentence Report focused on the amount of drugs attributable to her. The Presentence Report noted that, according to the MAPS data, Dr. Washington prescribed a total of 27,261 pills (the equivalent of 9,236 kilograms of

marijuana) during the conspiracy period. Taking Dillard's admission that she would "fill prescriptions at least once per week" and sell the drugs "roughly two to three times per week," the Presentence Report came up with a calculation of 10,097 pills (the equivalent of 3,676 kilograms of marijuana) based on twice-weekly sales and 15,146 pills (the equivalent of 5,514 kilograms of marijuana) based on thrice-weekly sales. The Report concluded that Dillard should be held responsible for a quantity of drugs no less than the equivalent of 3,676 kilograms of marijuana (based on twice-weekly sales) and no more than the equivalent of 9,236 kilograms of marijuana (based on the entire quantity of drugs prescribed by Dr. Washington). Either way, Dillard would have a base offense level of 34 based on the equivalent of at least 3,000 kilograms but less than 10,000 kilograms of marijuana.

Dillard objected that "[t]he formula devised by the Government and adopted by Probation is speculative at best." According to Dillard, there was no evidence that the admission of selling drugs two to three times a week extended over the whole life of the conspiracy. Dillard instead argued that the quantity of drugs attributable to her should be based on the prescriptions that she actually signed for, the prescriptions that were in her name, and the transactions to which she had specifically admitted.

In response, the government pointed out that neither Dillard nor Dr. Washington had identified any other participants in the conspiracy. The government also argued that all the drug activity was reasonably foreseeable to Dillard, who was an admitted participant. In the alternative, the government defended its calculation on the basis of Dillard's own admission and noted that the offense level would be the same whether the calculation is based on sales of twice a week or three times a week.

The district court made the following ruling on Dillard's objection:

[THE COURT:] The Court has before it the issue of the amount of drugs that were involved. The Defendant argues that she was in the conspiracy but that she was not doing the amount that the government contends. The Sixth Circuit requires in a conspiracy case, even though you plead to a conspiracy, that the Court must make a finding with regard to the individual conduct of the specific conspirator. And in terms of breaking it down, the statement of the Defendant with regard to two times a week appears—you don't contest that she made that statement and the statement is before the Court; is that correct?
MR. MAGIDSON [DILLARD'S COUNSEL]: The—we didn't contest that, Your Honor.
THE COURT: Right, right. And it seems, you know, therefore, with regard to the prescriptions written, that the Court will accept that as the guideline. Then the Court will go from that in terms of dealing with the actual sentence. But the guideline range is 135 to 168 based upon the figures provided by the government and based upon the Defendant's statement.

*Id.* at 519-20.  The Court ultimately sentenced defendant to concurrent terms of 112 months'

imprisonment on each count. Defendant filed an appeal in the Sixth Circuit, challenging the base offense level of 34 calculated under the Sentencing Guidelines. The Sixth Circuit rejected defendant's claim and affirmed her sentence. *See id*. at 520-21

The matter is currently before the Court on defendant's *pro se* motion to vacate her sentence pursuant to 28 U.S.C. § 2255, filed on July 15, 2013. Defendant contends that her sentence was improperly calculated based on the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). For the reasons that follow, the Court should summarily dismiss defendant's motion.

B.    *Legal Standard*

Rule 4 of the Rules Governing Section 2255 Proceedings for the United States District Courts provides, in relevant part, that "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion[.]" Rule 4, 28 U.S.C. foll. § 2255. Summary dismissal is appropriate under Rule 4 if the motion raises solely questions of fact which, even if true, would not entitle the movant to relief, *see Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000), or if the motion raises purely legal issues, *see Mathews v. United States*, 11 F.3d 583, 584-85 (6th Cir. 1993). *See also*, *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (under analogous Rule 4 governing § 2254 habeas proceedings, petition may be dismissed summarily if it "appears legally insufficient on its face[.]").

For the reasons that follow, the Court should conclude that defendant's motion for § 2255 relief is insufficient on its face. Accordingly, the Court should summarily dismiss the motion pursuant to Rule 4(b).

C.    *Discussion*

5

1.      *The Apprendi Line of Cases*

Defendant's motion is based on the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). *Alleyne* is the latest in a series of decisions addressing a trial court's role in finding facts necessary to the imposition of punishment. The line of cases begins with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).

In *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. Two separate majorities formed the Court's decision. Justice Stevens

delivered the opinion of the Court on the substantive question of whether the Guidelines are unconstitutional under *Apprendi*. Noting that there was no difference of constitutional significance between the Guidelines and the state guideline system at issue in *Blakely*, *see Booker*, 543 U.S. at 233, and rejecting the government's attempts to distinguish the two, *see id*. at 237-43, the merits majority concluded that the Guidelines violate the Sixth Amendment as interpreted in *Apprendi*. A separate majority joined an opinion authored by Justice Breyer, which contained the Court's decision on the remedial issue. The remedial majority concluded that the appropriate remedy for the constitutional violation was not to strike the Guidelines in their entirety, but to excise two statutory provisions which make the Guidelines mandatory. *See id*. at 245. Thus, under *Booker* the Guidelines remain advisory, and a federal district judge must consult the Guidelines before imposing sentence, but the judge is not bound to follow the Guidelines.

The Supreme Court repeatedly made clear, however, that the *Apprendi* rule was concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. The Court made a similar observation in *Blakely*, rejecting an argument raised by Justice O'Connor in her dissent:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits

7

judicial power only to the extent that the claimed judicial power infringes on the province of the jury.  Indeterminate sentencing does not do so.  It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty.  Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Notwithstanding these limitations on the *Apprendi* rule, in *Alleyne* the Court overruled *Harris*, and extended *Apprendi* to facts that increase a mandatory minimum sentence.  Reasoning that the *Harris* Court's distinction between facts that increase the statutory maximum and facts that increase a mandatory minimum is inconsistent with *Apprendi*, the Court in *Alleyene* held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt.  Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."  *Alleyne*, 133 S. Ct. at 2155 (citation omitted).  The Court was careful to note, however, that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury."  *Id*. at 2163.  Judges retain broad discretion to impose any sentence within the range authorized by law based on the jury's findings (or the facts admitted in a plea), and may judicially find facts in exercising this discretion.  *See id*.

2.    *Analysis*

Although defendant bases her motion on the Court's decision in *Alleyne*, it is not entirely clear from her motion whether she is bringing a claim based on *Alleyne*, or a more straightforward *Apprendi* claim.  In either event, her claim is plainly meritless and subject to summary dismissal.

8

1.     *Apprendi Claim*

To the extent defendant brings a straightforward *Apprendi* claim, the claim is baseless for two reasons. First, any such claim is procedurally defaulted, because defendant could have raised an *Apprendi* claim on direct appeal, but did not do so. *See United States v. Frady*, 456 U.S. 152, 167-68 (1982). *Phillips v. United States*, 229 F.3d 550, 552 (6th Cir. 2000). Second, defendant's *Apprendi* claim is without merit. The Indictment charged defendant with possessing with intent to distribute and conspiring to possess various Schedule II controlled substances. Because the Indictment did not charge a quantity, she was subject to no mandatory minimum term of imprisonment and to a maximum term of 20 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(C); *United States v. Farrad*, 41 Fed. Appx. 707, 709 (6th Cir. 2002) ("If a defendant simply possesses 'a controlled substance in schedule II,' with no specified quantity, he is subject to a maximum sentence of twenty years with no statutory minimum."). Here, defendant's sentence of 112 months' imprisonment (9 years, 4 months) is within the statutory maximum, and thus raises no *Apprendi* problem. Nor did the Court's calculation of a drug quantity for purposes of the Sentencing Guidelines raise a problem under *Blakely* and *Booker*. As *Booker* makes clear, judicial factfinding in scoring the Guidelines runs afoul of *Apprendi* only if the Guidelines are treated as binding. Here, consistent with *Booker*, the Court treated the Guidelines as advisory, and as only one factor bearing on the sentence in accordance with 18 U.S.C. § 3553(a). *See* Sentencing Tr., at 24 ("So let's go from the Guidelines to the other factors. Guidelines being one factor that's taken into account at sentencing."); *id*. at 34 ("Looking at a range of 108 to 135 and looking at the other factors before the Court, the Court will impose the following sentence: Pursuant to the Sentencing Reform Act, 1984, considering guidelines and the factors contained in 3553(a), . . . ."). Thus, defendant's

sentence was proper under *Apprendi* and *Booker*. *See  United States v. Worley*, 453 F.3d 706, 708 (6th Cir. 2006) ("[T]he district court's responsibility under *Booker* is to calculate the presumptive sentencing range under the guidelines and determine, applying the sentencing factors set out in 18 U.S.C. § 3553(a), whether the appropriate sentence lies within that range or outside it.").  And nothing in *Alleyne* alters this conclusion. *See United States v. Ibrahim*, ___ Fed. Appx. ___, ___, 2013 WL 3481421, at *4 (2d Cir. July 12, 2013); *cf. Alleyne*, 133 S. Ct. at 2163 (noting that the Court's decision did not abrogate the longstanding rule that judges may find facts in imposing a sentence within the authorized range).   Accordingly, to the extent defendant is raising a straightforward *Apprendi* claim, the claim is plainly meritless and subject to summary dismissal.

    2.    *Alleyne Claim*

    Likewise, to the extent defendant is attempting to raise a true *Alleyne* claim, the claim is meritless for two reasons.  First, *Alleyne* is not implicated at all because defendant was not subject to a mandatory minimum term of imprisonment.  As noted above, defendant was subject to a statutory maximum of 20 years' imprisonment and to no mandatory minimum term of imprisonment under 21 U.S.C. § 841(b)(1)(C).  And because the Guidelines were properly treated as advisory by the Court, she was subject to no Guidelines-mandated minimum term of imprisonment.  Thus, *Alleyne* is simply not implicated by defendant's sentence.

    Second, even if *Alleyne* were implicated by defendant's sentence, she cannot benefit from that decision.  Regardless of the merits of defendant's claim, it is barred by the non-retroactivity principle established by the Court in *Teague v. Lane*, 489 U.S. 288 (1989).  As the Supreme Court has explained:

> When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. *Griffith v. Kentucky,* 479 U.S. 314, 328

(1987). As to convictions that are already final, however, the rule applies only in limited circumstances. New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States,* 523 U.S. 614, 620-621 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks,* 494 U.S. 484, 494-495 (1990); *Teague v. Lane,* 489 U.S. 288, 311 (1989) (plurality opinion). Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley, supra,* at 620 (quoting *Davis v. United States,* 417 U.S. 333, 346 (1974)).

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle, supra,* at 495 (quoting *Teague,* 489 U.S., at 311). That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is *seriously* diminished." *Id.,* at 313 (emphasis added). This class of rules is extremely narrow, and "it is unlikely that any . . . 'ha[s] yet to emerge.'" *Tyler v. Cain,* 533 U.S. 656, 667, n. 7 (2001) (quoting *Sawyer v. Smith,* 497 U.S. 227, 243 (1990)).

*Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004) (footnote and parallel citations omitted).

Here, defendant's sentence became final 90 days after the Sixth Circuit affirmed her sentence on appeal, when her time for seeking *certiorari* in the United States Supreme Court expired. This occurred on February 18, 2013. This was five months prior to the Court's decision in *Alleyne*, which was filed on June 17, 2013. There is no question that *Alleyne* established a new rule of law, as the Court had to explicitly overrule existing precedent (*Harris*) to reach its result. Nor is there any question that *Alleyne* establishes a non-retroactive procedural rule that does not fall into one of *Teague*'s two narrow exceptions. The Sixth Circuit has repeatedly explained that *Booker* and *Blakely* constitute procedural rules that are not retroactively applicable on collateral review. *See Hicks v. United States*, 258 Fed. Appx. 850, 854 (6th Cir. 2007) (citing *Valentine v. United States*,

11

488 F.3d 305, 331 (6th Cir. 2007); *United States v. Saikaly*, 424 F.3d 514, 517 (6th Cir. 2005);

*Humphress v. United States*, 398 F.3d 855, 863 (6th Cir. 2005)).  And the courts that have thus far

considered the issue have uniformly reached the same conclusion regarding *Alleyne*.  *See United*

*States v. Reyes*, No. 06-654-1, 2013 WL 4042508, at *17-*18 (E.D. Pa. Aug. 8, 2013); *United States*

*v. Potter*, No. 7:03-21, 2013 WL 3967960, at *3 (E.D. Ky. July 31, 2013); *Affolter v. United States*,

No. 4:13CV01413, 2013 WL 3884176, at *2 (E.D. Mo. July 26, 2013); *United States v. Eziolisa*,

No. 3:10-cr-039, 2013 WL 3812087, at *3 (S.D. Ohio July 22, 2013); *United States v. Stanley*, No.

09-CR-0022, 2013 WL 3752126, at *7 (N.D. Okla. July 16, 2013); *cf. Simpson v. United States*, ___

F.3d. ___, ___ (7th Cir. July 10, 2013) (citations omitted) (noting in discussing 28 U.S.C. §

2255(h)(2), which permits a successive motion to vacate where the motion is based on a new rule

of law made retroactively applicable to cases on collateral review by the Supreme Court, that

"*Alleyne* is an extension of *Apprendi*" and because other extensions of *Apprendi* such as *Blakely*

have been held by the Supreme Court to not apply on collateral review, "[t]his implies that the Court

will not declare *Alleyne* to be retroactive.").  Because *Alleyne* is not implicated by defendant's

sentence, and because she cannot benefit from that decision even if it were implicated, defendant's

claim is plainly meritless and subject to summary dismissal.

D.    *Recommendation Regarding Certificate of Appealability*

1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides

that a defendant may not appeal a denial of motion to vacate unless a judge issues a certificate of

appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a

12

constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the movanat is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. foll. § 2255, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment

13

version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

If the Court accepts my recommendation that defendant's motion should be summarily dismissed, the Court should likewise deny a certificate of appealability. As explained above, it is clear that any claim based on *Apprendi* is procedurally defaulted, and is without merit because the Court treated the Guidelines as merely advisory in accordance with the Supreme Court's directive in *Booker*. Likewise, it is not reasonably debatable that *Alleyne* provides no relief to defendant, both because she was not subject to any mandatory minimum term of imprisonment and because, in any event, *Alleyne* is not retroactively applicable to her case. Accordingly, the Court should deny defendant a certificate of appealability.

E.    *Conclusion*

In view of the foregoing, the Court should conclude that defendant's claims are plainly meritless. Accordingly, the Court should summarily dismiss defendant's motion to vacate her sentence pursuant to Rule 4, 28 U.S.C. foll. § 2255. If the Court accepts this recommendation, the Court should also deny defendant a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED.

R. CIV. P. 72(b).  Failure to file specific objections constitutes a waiver of any further right of appeal.

*Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505

(6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which

raise some issues but fail to raise others with specificity, will not preserve all the objections a party

might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served

upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


<u>        s/ Paul J. Komives                                        </u>
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: <u>        9/5/13                                   </u>


## CERTIFICATION OF SERVICE

I hereby certify that a copy of this Order was mailed to defendant Dillard and Counsel of

Record  on September 5, 2013.


<u>    s/   Carol J. Bethel                      </u>
Case Manager

15